Filed 6/21/16  P. v. Molina CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE LUIS MOLINA,<br><br>    Defendant and Appellant. | F069827<br><br>(Super. Ct. No. VCF277752)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jose Luis Molina appeals from a judgment of conviction on 15 counts of lewd or lascivious conduct with a child under 14 years of age (Pen. Code,[1] § 288, subd. (a)), with

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

enhancements for multiple victim circumstances (§ 667.61, subds. (b), (e)(4)) and crimes involving substantial sexual conduct (§ 1203.066, subd. (a)(8)). The victims were his nieces. He was sentenced to indeterminate terms adding up to 135 years to life in prison.

The claims on appeal allege instructional error, abuse of discretion with respect to certain evidentiary rulings, and a lack of sufficient evidence to support two of the convictions. Molina also presents a jurisdictional challenge based on the statute of limitations and ex post facto principles. Finding no grounds for reversal, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The victims in this case are sisters, hereafter referred to (in order of youngest to oldest) as Diana, Angelica, A.G., and Elizabeth. Molina is the victims' uncle by way of marriage to their maternal aunt. The underlying events occurred over a span of approximately 10 years, when Molina was between the ages of 27 and 37 years old. The children's respective ages at the time of their abuse ranged from 7 to 13.

The victims apparently grew up in an unstable environment, with both parents absent from their lives for stretches of time due to incarceration. The girls lived with Molina and his wife for approximately one year beginning in 2002, having been placed in their care by Child Protective Services, and temporarily resided with them again in 2008. When they were not living with him, the victims spent time at Molina's house while their mother was at work and on various other occasions.

In 2005, at the age of 16, Elizabeth disclosed to her mother that Molina had raped her when she was 13 years old. A report of the allegation was filed with the Porterville Police Department in December 2005. It is unclear from the record how the authorities handled the complaint, but Molina was not charged at that time. In May 2006, Angelica and A.G. came forward with their own allegations of abuse. A second police report was filed with the Porterville Police Department, with the same result as six months earlier. Finally, in 2012, similar accusations made by the youngest victim, Diana, were brought

2.

to the attention of a detective from the Tulare County Sheriff's Department named Katherine Garcia. Detective Garcia investigated Diana's claims and looked further into the reports made by her sisters in 2005 and 2006, which ultimately led to Molina's prosecution.

Molina was charged by information with 15 counts of committing a lewd act against a child in violation of section 288, subdivision (a). Counts 1 and 2 were based on allegations of misconduct against Diana, specifically the acts of rubbing lotion on her legs and touching her vaginal area. Counts 3 and 4 alleged that Molina engaged in the same type of behavior with Angelica. Counts 5 through 10 pertained to A.G., and alleged various forms of touching that included oral copulation and intercourse. Counts 11 through 15 related to Molina's abuse of Elizabeth, i.e., the acts of rubbing lotion on her legs, kissing her lips, touching her vagina with his hands and mouth, and intercourse. Each count was accompanied by a multiple victim enhancement allegation pleaded pursuant to section 667.61, subdivision (b). Allegations of "substantial sexual conduct" for purposes of section 1203.066, subdivision (a)(8) were included in Counts 2, 4, 5, 6, 9, 10, 12, 14, and 15.

The case was tried before a Tulare County jury in May 2014. In addition to first-hand accounts from all four victims, the prosecution's case-in-chief included testimony from the victims' mother and Detective Garcia, as well as a brief examination of Molina's wife. The prosecution also elicited expert witness testimony from Anthony Urquiza, Ph.D., on the topic of child sexual abuse accommodation syndrome (CSAAS). The defense case consisted of testimony from Molina's sisters and other relatives, all of whom said that they had no knowledge of him ever behaving inappropriately with children. We provide an abbreviated summary of the trial evidence here, and include additional details in the Discussion where relevant to Molina's specific claims.

Counts 1-2

Diana, who was 18 years old at the time of trial, described two events that occurred when she was around the age of 12. In the first incident, Molina instructed her to put on his wife's nightgown and lie down on a bed, which she did. He proceeded to rub lotion on her legs, working his way up past her thighs and eventually inserting his finger into her vagina. He stopped what he was doing when she began to cry, then washed his hands and told her to change back into her clothes. On the second occasion, Diana awoke from sleep to find Molina applying lotion to her legs. She immediately excused herself to the bathroom and then went off to sleep in one of her sisters' rooms.

Counts 3-4

Angelica, testifying at the age of 20, described incidents that took place when she was in third or fourth grade. One time, after helping Molina wash his car, he took her into a room and undressed her. He then spread her legs, moved his face near her vagina, and started "sniffing." Molina exhibited similar behavior on another occasion, and that incident progressed to vaginal touching. He applied lotion to Angelica's legs during the second incident, which was something he did "constantly" to her and her sisters. According to Angelica, Molina insisted upon rubbing lotion on their legs anytime they went swimming, and also at nighttime.

Counts 5-10

A.G. was 21 years old when she testified at trial. She claimed Molina sexually abused her on a regular basis from approximately the time she was 7 until she reached the age of 13. The first incident occurred in a car after Molina took a detour while transporting A.G. from her mother's house to his own home. He pulled into a parking area, and while parked there placed his mouth on her genitals before inserting his penis into her vagina. Subsequent incidents involved the fondling and kissing of her breasts, digital penetration, and oral copulation, and always culminated in intercourse. Similar to

4.

his behavior toward Diana, Molina sometimes made A.G. wear his wife's lingerie. A.G. also confirmed that Molina frequently rubbed lotion on all of the victims' legs.

Counts 11-15

Elizabeth was 25 years old at the time of trial. Her testimony described two instances of sexual assault, the first occurring when she was approximately 12 years old and the second when she was 13. In the first incident, Molina had been driving the two of them home from church when he headed into a wooded area, claiming to be taking a shortcut. Next, as described by Elizabeth, "he stopped the van and climbed in the back seat where [she] was, and he tried kissing [her] and was fondling [her] breasts, and he tried going down, but [she] kicked him in between the legs." Her resistance caused him to return to the front seat and resume driving.

Molina was more forceful during the second incident, which took place inside of his home. Elizabeth testified that he "grabbed [her] and threw [her] on his bed," then removed his pants and began touching and licking her genitalia. He proceeded to fondle her breasts and then inserted his penis into her vagina, ignoring her pleas to stop. In addition to describing the two assaults, Elizabeth attested that Molina would apply alcohol and lotion to the legs of her and her sisters on an almost nightly basis for the purported purpose of preventing "a rash" caused by mosquito bites.

Verdict and Sentencing

The jury deliberated for less than two hours before returning a verdict finding Molina guilty on all counts and all enhancement allegations to be true. In light of the jury's multiple victim circumstance findings, Molina was sentenced under the alternative sentencing scheme of the "One Strike" law, which required an indeterminate sentence of 15 years to life in prison for each count. (§ 667.61, subds. (b), (c)(8), (e)(4); see *People v. Anderson* (2009) 47 Cal.4th 92, 101.) Using Count 2 as the principal term, the trial court imposed consecutive sentences for Counts 4, 5, 6, 9, 10, 12, 14, and 15, thus resulting in an aggregate prison term of 135 years to life. Concurrent sentences were

5.

imposed for all remaining counts, including Counts 11 and 13, i.e., the ones at issue in Molina's claims of instructional error and insufficient evidence.

**DISCUSSION**

**Evidentiary Rulings**

Admissibility of CSAAS Evidence

Molina alleges the trial court erred by allowing the prosecution to introduce expert witness testimony about CSAAS, which, generally speaking, is the phenomenon of child sex abuse victims keeping their victimization a secret and/or waiting for long periods of time before revealing details of the abuse. Molina attempts to frame the issue in terms of the so-called *Kelly*/*Frye* rule (*People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) / *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 (*Frye*)), referring to the foundational requirements established through case law to show the reliability, and thus admissibility, of evidence involving new scientific procedures or techniques (now more commonly known as the "*Kelly* test"). (*People v. Jones* (2013) 57 Cal.4th 899, 936 (*Jones*).) As a secondary argument, he contends that the admission of CSAAS evidence constituted an abuse of the trial court's discretion under Evidence Code section 352. We reject both claims.

According to the prosecution's expert, Dr. Urquiza, the concept of CSAAS originated in a scholarly article published in 1983 by Dr. Roland Summit. The piece was intended for therapists who were or would be treating child victims of sexual abuse, with the goal of dispelling certain misunderstandings and myths about those types of patients. Through his own clinical experience and research over the past three decades, Dr. Urquiza has generally found the tenets of CSAAS, as described in the original article, to be accurate. He has testified as a CSAAS expert in over 200 criminal cases.

Both sides filed motions in limine concerning the admissibility of CSAAS evidence during the prosecution's case-in-chief. The defense motion to exclude Dr. Urquiza's testimony relied primarily on an academic paper published in 2005 in which the authors argued that empirical data has shown "there is no convincing evidence

6.

that CSAAS testimony on denial or recantation provides relevant or reliable assistance to [a] fact finder to assess allegations of [child sexual abuse]." When the parties' motions were heard, the trial court advised that it had dealt with CSAAS issues in prior cases and believed there was ample authority supporting the general admissibility of such evidence. The court ruled to allow the prosecution's expert to present "a very generic" summary of what CSAAS is and how it relates to children.

Dr. Urquiza's trial testimony summarized the five basic components of CSAAS: (1) Child victims of sexual abuse often keep the abuse a secret, despite a common misconception that the natural response is to "tell somebody right away." Children are most often abused by someone they know, and may even care for that person on a certain level. It is not uncommon for the perpetrator to pressure the child to remain silent through intimidation, threats, or manipulation. (2) The victim often feels helpless in a way that may seem irrational to an outside observer, the misconception being that a typical response would be to run away or find some other means of protecting themselves. (3) The third tenet of CSAAS is described in terms of entrapment and accommodation. Entrapment refers to victims' feelings of being stuck or trapped in the cycle of abuse. Accommodation occurs when the victim tries to cope with the experience by suppressing bad feelings, which can result in a flat affect. When the child eventually discusses the abuse, he or she may do so without showing any emotion. (4) Delayed and unconvincing disclosure refers to the gradual and sometimes ambiguous revelations of the abuse, despite the common misconception that a child would immediately and fully recount the traumatic events. (5) Retraction refers to the recanting of a truthful disclosure about the molestation, though modern research suggests this occurs in only a minority of cases.

The California Supreme Court has long recognized the admissibility of expert testimony regarding CSAAS to rebut misconceptions a jury may hold about how child victims react to sexual abuse. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301

7.

(*McAlpin*); see *People v. Brown* (2004) 33 Cal.4th 892, 905-906.)  When introduced for that purpose, and limited to the expert's own clinical experience and familiarity with the relevant professional literature, the admission of CSAAS evidence does not implicate *Kelly/Frye* principles.  (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449.)  Furthermore, "*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.)

Dr. Urquiza's trial testimony merely summarized Dr. Summit's original article from 1983, described his own clinical experiences, and discussed other relevant studies in the field.  He claimed to have no knowledge of the underlying facts of the case, nor any opinions regarding the veracity of the witnesses' testimony or the defendant's culpability.  The expert emphasized that CSAAS cannot be relied upon as a diagnostic tool to determine whether an individual had been sexually abused.  Given these circumstances, appellant's challenge to the admissibility of Dr. Urquiza's testimony under *Kelly/Frye* standards is misguided and untenable.

CSAAS evidence may be introduced during the prosecution's case-in-chief to rehabilitate a victim's credibility when the defense suggests an aspect of the victim's behavior, such as secrecy or delayed reporting, is inconsistent with their allegations of sexual abuse.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)  If the trial court allows such evidence to be admitted, it will typically instruct the jury that the expert's testimony is not proof the victim's allegations are true, and is admissible only for the purpose of showing the victim's behavior was not necessarily inconsistent with conduct normally exhibited by someone who has been abused.  (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073-1074 [limiting instruction must be given upon request]; *People v. Housley* (1992) 6 Cal.App.4th 947, 958-959 [holding that trial courts have a sua sponte duty to provide a limiting instruction].)  As with other types of expert witness testimony, the admissibility of CSAAS evidence is ultimately subject to the

8.

discretion of the trial court, and its decision to admit or exclude the testimony " 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

The testimony of the victims in this case touched upon all five components of CSAAS. Each child had kept the abuse a secret for years and delayed coming forward with their accusations. Elizabeth's testimony raised issues concerning the "helplessness" and "entrapment" aspects of the syndrome; she claimed Molina had threatened that if she told anyone about the rape, she and her sisters "would get taken away again, and [] would all get separated and put into different foster homes again." A.G. testified that Molina made similar threats to her, and she acknowledged withholding information about her own abuse when Elizabeth went to the police in 2005. A.G. also admitted to briefly retracting her allegations under pressure from Molina's wife. Defense counsel questioned the victims about these behaviors with implied skepticism, particularly as to the sisters' claims of having kept their experiences a secret from each other, and their failure to be more vigilant in trying to prevent recurrences of the abuse.

Dr. Urquiza did not take the stand until after all four victims had been cross-examined. Given the state of the record at that time, it was within the trial court's discretion to allow the expert to testify as he did about CSAAS. The jury was later given the standard limiting instruction set forth in CALCRIM No. 1193 ("Testimony on Child Sexual Abuse Accommodation Syndrome"). In summary, the expert testimony relating to CSAAS was narrowly confined and based upon a proper foundational showing by the prosecution. There is nothing in the record to suggest that the trial court exercised its discretion to admit the challenged evidence in an arbitrary, capricious, or unreasonable manner.

Admissibility of Evidence to Prove Intent

Over objections by defense counsel, the prosecution introduced evidence pertaining to Molina's intimate behavior with his wife, including his apparent fondness

for rubbing lotion on her legs prior to sex. Molina complains that this evidence had only marginal relevance and "slight" probative value, and should have been excluded pursuant to Evidence Code section 352. We are not persuaded by his arguments.

The defense moved in limine to exclude all statements that were made by Molina during a recorded interview with Detective Garcia prior to his arrest. In response, the prosecution clarified its intention to present "testimony from the defendant's wife, Teresa Molina, that he would have her put on lingerie and he liked to rub lotion on her legs and back before they had sex." The prosecution explained that Molina had confirmed this information during his recorded police interview, and argued the evidence was admissible under Evidence Code section 1101, subdivision (b) to show intent and a common scheme or plan. Agreeing with the prosecution, the trial court ruled as follows: "I feel that the probative value [of the evidence] clearly outweighs the prejudicial effect given the fact that [the] alleged victims in this case can testify about this common scheme and plan, and so I feel it's very, very relevant."

The prosecution later elicited a summary of Molina's pre-arrest statements from Detective Garcia in lieu of playing the recorded interview for the jury. Detective Garcia testified that when asked about "his typical sex life with his wife," Molina admitted he often rubbed lotion on his wife's body as a prelude to intercourse. He also acknowledged that his wife wore lingerie when they had sex.

Molina's wife testified that her husband sometimes rubbed alcohol and lotion on her legs prior to sex. He did so at her request because the rubdowns helped to alleviate chronic pain, which she experienced as a result of her failing health.[2] She confirmed that it was customary for her to wear certain "nightgowns" during intercourse.

---

[2] The record does not specify the nature of Mrs. Molina's health problems, but it appears she had a terminal illness and passed away soon after her husband was convicted in this case.

10.

Under Evidence Code section 1101, subdivision (b), propensity evidence, i.e., evidence tending to show the defendant's disposition to commit a certain type of act, "is nevertheless admissible, if relevant, to raise an inference of (and hence prove) his motive or intent when he committed his crimes." (*Jones*, *supra*, 57 Cal.4th at p. 952.) Such evidence may also be admitted for the purpose of demonstrating a particular modus operandi. (*People v. Carter* (2005) 36 Cal.4th 1114, 1154.) "To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1194 (*Cole*).) Evidence Code section 352 further requires that the probative value of the evidence not be "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

A trial court's rulings on relevance and the admission of evidence under Evidence Code sections 1101 and 352 are reviewed for abuse of discretion. (*Cole*, *supra*, 33 Cal.4th at p. 1195.) Evidence is relevant if it logically tends to prove a material issue in the case, such as identity, motive, or intent. (Evid. Code, § 210; *People v. Garceau* (1993) 6 Cal.4th 140, 177.) Here, the conduct at issue in Counts 1 and 11 was the application of lotion to the victims' legs, and the prosecution needed to prove that Molina engaged in such behavior "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of himself or the victims. (§ 288, subd. (a).) Moreover, Diana and A.G. testified that Molina sometimes made them wear his wife's nightgowns when he abused them. Under these circumstances, the challenged evidence had sufficient relevance and was admissible pursuant to Evidence Code section 1101, subdivision (b).

As used in Evidence Code section 352, the term "undue prejudice" refers to "the tendency of evidence to evoke an emotional bias against a party because of extraneous factors unrelated to the issues." (*People v. Cortez* (2016) 63 Cal.4th 101, 128.) The

11.

statute is not concerned with "the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).) "Thus, evidence is subject to exclusion under Evidence Code section 352 on the basis of prejudice only ' "when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." ' " (*Cortez*, *supra*, 63 Cal.4th at p. 128.)

Proof that consensual sexual relations between a husband and wife involved the wearing of lingerie and was preceded by massages with lotion does not strike us as the type of evidence " 'which uniquely tends to evoke an emotional bias against the defendant as an individual.' " (*Karis*, *supra*, 46 Cal.3d at p. 638.) Molina submits that the challenged testimony portrayed him "as somewhat deviant sexually by showing he would blend his role as a caregiver to his wife with his sexual urges[,]" and thus cast him "in a seedy, unflattering light, allowing the jury to believe he was more concerned with his own sexual desires than the wellbeing of his wife." These arguments are creative, but unconvincing. In any event, he fails to show the trial court erred by concluding the potential for such a reaction by the jury did not substantially outweigh the probative value of the evidence. We cannot say the trial court's assessment of these factors constituted an abuse of discretion, i.e., that its decision to admit the evidence was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

**Sufficiency of the Evidence**

Standard of Review

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable

doubt.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118.)  The standard of review is "highly deferential" to the jury's verdict.  (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.)  " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Burney* (2009) 47 Cal.4th 203, 253.)  In other words, "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Count 11

Molina was convicted of violating section 288, subdivision (a) by rubbing lotion on Elizabeth's legs at some point between January 1, 2000 and February 2, 2003.  The conviction was apparently based on Molina's pattern of rubbing lotion on her legs at night for the stated purpose of treating mosquito bites.  On appeal, Molina argues there is insufficient evidence that he engaged in such behavior with a criminal intent.

Section 288, subdivision (a) criminalizes the commission of a lewd or lascivious act upon a child under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of the perpetrator or the child.  "*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim." (*People v. Lopez* (1998) 19 Cal.4th 282, 289, original italics.)  For example, an ostensibly innocent embrace or similar display of "[p]hysical affection among relatives, generally considered acceptable conduct, nonetheless could satisfy the 'any touching' aspect of section 288 … if accompanied by the requisite lewd intent." (*Id*. at p. 291.)

As this court explained in *People v. Pitts* (1990) 223 Cal.App.3d 606, "[t]he question of intent is one of fact, to be determined by the jury ' "except in a case where the

facts proven afford no reasonable ground for an inference as to intent." ' [Citation.]
Intent is rarely susceptible of direct proof and must usually be inferred from a
consideration of all the facts and circumstances shown by the evidence." (*Id*. at pp. 887-
888.) Thus, in deciding the question of intent as presented by Count 11, the jury was free
to consider all of the evidence concerning Molina's use of lotion as a means of gratifying
his sexual desires.

Pointing to evidence that he used lotion in conjunction with other overtly sexual
acts against Diana and Angelica, Molina argues that because his application of lotion to
Elizabeth's legs was not accompanied by other forms of sexual touching, the jury could
not reasonably have read a lewd or lascivious intent into his behavior. This argument
fails to construe the evidence in the light most favorable to the judgment. Considering
the additional testimony regarding how he incorporated lotion into foreplay with his wife,
the evidence supported a reasonable hypothesis that Molina had something akin to a
fetish with rubbing lotion on legs. Although there was evidence of an innocent
explanation behind the behavior at issue (i.e., alleviating the symptoms of mosquito
bites), the jury nevertheless had a rational basis for inferring a wrongful intent based on
the totality of the circumstances. Therefore, the evidence in support of the Count 11
conviction cannot be characterized as insufficient.

Count 13

Molina was charged in Count 13 of the information as follows: "On or about and
between January 1, 2000 and February 2, 2003, in the County of Tulare, the crime of
LEWD ACT UPON A CHILD, TO WIT, KISSING LIPS, in violation of Penal Code
section 288(a), a FELONY, was committed by JOSE LUIS MOLINA, who did willfully,
unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and
certain parts and members thereof of [Elizabeth], a child under the age of fourteen years,
with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual

14.

desires of the said DEFENDANT and the said child." (Original capitalization, additional emphasis omitted.)

Molina argues that while "there is some evidence [he] may have kissed [Elizabeth], there is no evidence he kissed her on the lips." Respondent disagrees with this argument, maintaining that the requisite touching can be inferred from the victim's trial testimony. Proof of the elements of the offense was limited to the following exchanges between Elizabeth and the prosecutor:

Prosecutor: What's the first time that you can ever remember something happening?

Elizabeth: We had – we were going to church, and on the way back to church, he took a detour into like the woods, and I asked him where we were at, and he said we're just taking a shortcut, and then he stopped the van and climbed in the back seat where I was, and he tried kissing me and was fondling my breasts, and he tried going down, but I kicked him in between the legs.

Prosecutor: So he was kissing you and fondling your breasts, you said?

Elizabeth: Yes.

Prosecutor: Okay. And then was that over your clothing or-

Elizabeth: Yes.

Prosecutor: - over – okay. What happened when you kicked him?

Elizabeth: He said ouch and went back in the driver's seat, and we took off.

Prosecutor: So was anybody else in the car at that time?

Elizabeth: No.

Prosecutor: Okay. And you said you were going to church?

Elizabeth: On the way back from church.

Prosecutor: How old were you when that happened?

Elizabeth: Twelve.

15.

…

Prosecutor: The time that you said this happened the first time on your way back home from church -

Elizabeth: Hm-hmm,

Prosecutor: and you told us that after he was kissing you and fondling your breasts that he tried to touch you?

Elizabeth: Yes.

Prosecutor: Did he actually touch you?

Elizabeth: No.

Prosecutor: So it was only the breast touching at that time and kissing?

Elizabeth: Yes.

As a preliminary matter, we note the prosecution included an unnecessary level of specificity in its pleading of the Count 13 offense by alleging Molina kissed Elizabeth on the lips. An accusatory pleading need only provide reasonable notice of the offense charged, which may be accomplished by "a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused." (§ 952; *People v. Thomas* (1987) 43 Cal.3d 818, 826.) Nonessential averments may be disregarded as surplusage. (*People v. Matula* (1959) 52 Cal.2d 591, 598.)

"As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction." (*People v. Jones* (1990) 51 Cal.3d 294, 315.) "The victim, of course, must describe the *kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of

16.

proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment…. Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Id*. at p. 316, original italics.)

Pursuant to these principles, and based on the express language of section 288, subdivision (a), the jury could have found the elements necessary for a conviction on Count 13 by relying on evidence of "any touching" committed with the wrongful intent proscribed by the statute. Proof that Molina kissed Elizabeth with a wrongful intent, under the circumstances she described, was sufficient to sustain a conviction regardless of where on her body she was kissed. Assuming for the sake of argument that the prosecution imposed upon itself the heightened burden of proving Molina kissed Elizabeth on the lips, there is still sufficient evidence to support the jury's verdict. In common parlance, phrases such as "he tried kissing me" or "he tried to kiss me" are sometimes used to describe an unreciprocated kiss, meaning one party touched another's lips with their own but the gesture was not well received or returned in kind. The jury could have reasonably interpreted Elizabeth's testimony in this manner, and such an interpretation would have been supported by her affirmative responses to the prosecution's follow-up questions, which were obviously intended to clarify that Molina did in fact kiss her. To the extent those questions were leading or otherwise improper, Molina's failure to object renders the issue moot. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 687 [failure to object on grounds that a question assumes facts not in evidence forfeits consideration of the claim on appeal].) Accordingly, and for all of the

17.

reasons stated above, we conclude there is sufficient evidence to support the Count 13 conviction.

**Alleged Instructional Error**

Molina cites to Elizabeth's testimony that "he tried kissing me" as the basis for a claim that the trial court had a sua sponte duty to instruct on *attempted* lewd or lascivious conduct with a child as a lesser included offense under Count 13. Alternatively, he alleges ineffective assistance of counsel based on his trial attorney's failure to request that such an instruction be given. Both arguments lack merit.

Whether or not the trial court should have given a " 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568, quoting *People v. Waidla* (2000) 22 Cal.4th 690, 733.) Molina's claim of instructional error is therefore subject to de novo review. (*Cole, supra,* 33 Cal.4th at p. 1218.) The same standard applies to his ineffective assistance of counsel claim. (*In re Alcox* (2006) 137 Cal.App.4th 657, 664.)

A trial court's sua sponte duty to instruct on general principles of law relevant to the case includes " 'giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Thus, the duty to instruct on a lesser included offense arises "only if there is substantial evidence supporting a jury determination that the defendant was in fact guilty only of the lesser offense." (*People v. Parson* (2008) 44 Cal.4th 332, 348-349.) "Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.)

To prove an attempted violation of section 288, subdivision (a), the prosecution must show "(1) the defendant intended to commit a lewd and lascivious act with a child

under 14 years of age, and (2) the defendant took a direct but ineffectual step toward committing a lewd and lascivious act with a child under 14 years of age." (*People v. Singh* (2011) 198 Cal.App.4th 364, 368 (*Singh*).) Because the statute prohibits all forms of touching done with a wrongful intent, it is relatively uncommon for a defendant to be convicted of merely attempting to commit a lewd or lascivious act with a child. (See *People v. Memro* (1985) 38 Cal.3d 658, 697, fn. 48, disapproved of on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2 ["There are very few appellate decisions involving attempted section 288 violations."].) It is difficult to imagine the crime occurring outside of a scenario in which intervening events prevent the perpetrator from making physical contact with his intended victim. (E.g., *Singh*, *supra*, 198 Cal.App.4th at pp. 367-368 [defendant arrested in an undercover sting operation aimed at "'protecting kids from internet predators,'" which was documented by reporters for "NBC's *Dateline* television show"].)

The record does not contain substantial evidence in support of the proposition that if Molina was guilty under Count 13, he was only guilty of taking a direct but ineffectual step toward committing a lewd and lascivious act against his niece. Elizabeth's testimony concerning the events upon which the charge was based described multiple forms of physical contact, namely the fondling of her breasts and "kissing." As between an attempted violation or an actual violation of section 288, subdivision (a), no reasonable juror who believed any portion of Elizabeth's story about this incident could have concluded that Molina was only guilty of the lesser crime. In light of our conclusion in this regard, we need not further address the ineffective assistance of counsel claim. (*People v. Jennings* (2010) 50 Cal.4th 616, 667, fn. 19; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836 [failure to request a factually unsupported jury instruction is not ineffective assistance of counsel].)

19.

**Claims re: Statute of Limitations**

The easiest way to address Molina's statute of limitations argument is to first explain how and why all of the charges in this case were timely filed. We begin by noting that the subject events were alleged to have occurred between July 1999 and June 2009. Criminal proceedings were initiated on January 14, 2013 with the filing of a felony complaint. All victims were under the age of 18 at the time of the offenses, and the eldest victim was 25 years old at the time of trial.

Prior to 2001, the limitations period for a violation of section 288, subdivision (a) was six years. (Former § 800; *People v. Smith* (2011) 198 Cal.App.4th 415, 424.) On January 1, 2001, the enactment of new legislation extended the statute of limitations for felonies enumerated in section 290, including violations of section 288, to 10 years. (Former § 803, subd. (h), as enacted by Stats. 2000, ch. 235, § 1; *People v. Simmons* (2012) 210 Cal.App.4th 778, 788 (*Simmons*).) Former section 803, subdivision (h)(1), provided in relevant part: "Notwithstanding the limitation of time described in Section 800, the limitations period for commencing prosecution for a felony offense described in subparagraph (A) of paragraph (2) of subdivision (a) of Section 290, where the limitations period set forth in Section 800 has not expired as of January 1, 2001, or the offense is committed on or after January 1, 2001, shall be 10 years from the commission of the offense… ." Section 803 underwent multiple changes in subsequent years, but the 10-year statute of limitations applicable to section 288, subdivision (a) remained in effect at all times relevant to this case. (§ 803, former subd. (h)(2), as amended by Stats. 2000, ch. 235, § 1, pp. 2338–2342, renumbered as § 803, former subd. (i)(2), as amended by Stats. 2001, ch. 235, § 1, pp. 2121–2126, renumbered as former § 801.1, added by Stats. 2004, ch. 368, § 1, p. 3470; *In re White* (2008) 163 Cal.App.4th 1576, 1580-1581 (*White*).) Therefore, as of January 2001, the applicable limitations period for the crimes Molina was alleged to have committed as early as July 1999 was extended until at least July 2009.

Beginning January 1, 2006, by operation of former section 801.1, subdivision (a), the prosecution of certain sex offenses, including section 288 violations, could be commenced "any time prior to the victim's 28th birthday" if the crime was "alleged to have been committed when the victim was under the age of 18 years." (Stats. 2005, ch. 479, § 2; *Simmons*, *supra*, 210 Cal.App.4th at p. 787.) A more recent amendment to section 801.1 allows the prosecution of such crimes, if alleged to have been committed when the victim was under 18 years of age, to be commenced any time prior to the victim's 40th birthday. (§ 801.1, subd. (a)). In summary, based on various legislative enactments that went into effect in 2001 and 2006, all charges against Molina were filed within the applicable statute of limitations.

Molina contends that application of the Legislature's extension of the statute of limitations to crimes committed before the previously applicable limitations periods had expired was a violation of ex post facto principles. The argument relies on the constitutional prohibition against laws with retroactive application to events occurring before their enactment and which disadvantage the offender by altering the definition of criminal conduct or increasing the punishment for a crime. (*People v. Trujeque* (2015) 61 Cal.4th 227, 256; *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306.) However, Molina concedes "that various courts of appeal in California have held in published decisions that extending a limitations period before it has expired is not a violation of the ex post facto clause."

In *Stogner v. California* (2003) 539 U.S. 607 (*Stogner*), the United States Supreme Court held that application of former section 803, subdivision (g) to revive a previously time-barred prosecution violated the ex post facto clause of the federal Constitution. (*Stogner,* at pp. 609-611, 632-633.) In reaching this conclusion, the high court stated that its decision "does not prevent the State from extending time limits for the prosecution of future offenses, *or for prosecutions not yet time barred*." (*Id*. at p. 632, italics added.) Our district has interpreted the language in *Stogner* to mean that applying the legislative

21.

extension of a statute of limitations to offenses committed before the previously applicable time period has expired does not violate ex post facto principles.  (*People v. Shaw* (2009) 177 Cal.App.4th 92, 102; *White, supra,* 163 Cal.App.4th at p. 1583.)  We follow that precedent here, and thus reject appellant's claim.

## **DISPOSITION**

The judgment is affirmed.


_____

GOMES, Acting P.J.

WE CONCUR:


_____

PEÑA, J.


_____

SMITH, J.

22.